Hear ye, hear ye, hear ye. The United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States and His Honorable Court. Good morning and welcome to a very different oral argument week and thank you all very much for participating by phone. Judge Cho Flatt, Judge Hull and I will do our best to try to make sure that this works seamlessly. We may have a couple of instances where we talk over each other because we're not looking at each other and have no visual cues but we'll make sure that we try to work it out as best as possible. If at any time you don't understand what we're saying or can't hear us, please let us know and we'll try to get our IT people to fix the problem. Valerie, our courtroom deputy, will give you a warning when you have about two minutes left and that'll provide you with at least a guidepost about when your time is drawing to a close. With that, we'll start with our first case which is number 18-13426, United States v. Darius Caldwell. How do I pronounce your last name? Is it Monin or Monin? It's Monin, Judge Jordan. Okay, Mr. Monin, whenever you're ready. We know you're court-appointed for Mr. Caldwell. We want to thank you on behalf of the court and obviously on behalf of your client for the service that you're providing. We really do appreciate it. Thank you, Judge Jordan. That's actually one of the things I wanted to mention. I'm not appointed solely for purposes of this appeal, but I actually tried Mr. Caldwell's case. I was appointed in the pre-trial phase of his prosecution. I tried his case and Judge Cohen appointed me to his appeal. So my representation on appeal also involves the motion for new trial, which came up after my client's sentencing and while this case was pending on appeal. So I'm not sure the degree to which the panel sees appointed counsel who have both tried as well as handled the case on appeal, but I just wanted to note for the court's reference that that's my status in this case. Well, double thank you, whenever you're ready. Good, thank you very much. So I have raised three errors on appeal. The first is that Judge Cohen should have granted my motion for new trial, which is now before this panel, based on not misrepresented but misstated testimony by an FBI examiner who appeared at trial to testify to DNA DNA evidence for identification purposes. The second issue that I have on appeal is that Judge Cohen also erred in failing to suppress a show-up identification involving the victim teller, where the police, after arresting my client and had him in a squad car in handcuffs, transported the teller to the scene of the arrest and then conducted a show-up from there. And it's my contention that that show-up was unduly suggestive and prejudicial to my client because the government then introduced that identification testimony at trial. The third issue that I have on appeal, and that's actually where I'd like to start, Judge Jordan and members of the panel, is whether the government proved sufficient evidence of the federally insured status or the federal insurance status of the victim branch. And I know that this may sound odd because the Bank of America branch in Smyrna, Georgia, obviously there's not a lot of contention or there's not a huge amount of concern as to whether Bank of America at the corporate or national association level would be federally insured. But I believe that the case law, including a case in which Judge Choplat dissented in 2019 called United States v. Monksguard. It's 913 S. 3rd 1327. It's an 11th Circuit case from last year, where what the courts have said is that if the government is going to prove federal insurance for purposes of the bank robbery statute, it is insufficient to simply bring in a court security officer with a charter of federal insurance at the national bank level and simply proffer that charter, which in this case was from decades ago, and say that that national charter necessarily, just based on the court, or not court, but based on the corporate security officers say so, covers the victim branch. And I know, I know you think, this is Judge Jordan, Mr. Mon, and I don't, I know you think the evidence was insufficient, but there was a little more here than just that The way that I would put it, Judge Jordan, is that there were two banks involved. And I think a decent lesson in the evidence, when the second victim bank court, I keep on saying court, corporate security officer testified, she brought the evidence down to the level of the branch in a way that the Bank of America security officer did not. She spoke about FDIC audits, she spoke about displays of FDIC insurance at the branch, and what goes into being able to show that. She spoke to fees being paid all the way down to the branch level. So yes, Judge Jordan, I quoted and I included the colloquy that I had on cross with the corporate security officer for the Bank of America branch. And I do believe, yes, it's true that the court, or the corporate security officer was speaking in terms of, in his experience, the charter extends down to the victim branch level, but there really wasn't any proof of that. Certainly no proof in the way that the bank security officer for the first-in-time victim bank, the North Atlanta Bank, offered in evidence at trial, including following some questions from the court itself. So I just think that there, in the cases, there has been the criticism of the government for doing exactly what happened here, which is bringing in a corporate security officer, putting a national charter of insurance in, and basically leaving things at that level. Other than the corporate security officer simply saying, in his experience, or when he has previously testified that this has been sufficient, things along those lines. So if there aren't any additional questions on the third assertion of error that I have, with respect to the first assertion of error, the new trial motion, I want to be as clear and as careful as I can. And I am not a DNA expert, to the point that I made earlier about being appointed twice in this case. I feel like I became more of one, and certainly Mr. Hobson, opposing counsel, well understands the DNA evidence in this case as well. But what we're talking about here is, when I was a prosecutor and we put DNA evidence in, the tendency from the FBI lab examiners was to speak of a likelihood of the defendant himself or herself being a contributor of DNA. So the likelihood that was testified to would be a likelihood that, and I'm putting air quotes, you can't see me, but I'm putting air quotes around that. Formerly, it was testimony that the defendant himself was the contributor of DNA to the referenced sample. What we're talking about in this trial, members of the panel, is a proffer of DNA evidence where all of the implements of the crime, the wig, the bandana, and the handgun, each contained a mixture of DNA. And because there was a mixture of DNA on each of those implements, what the FBI examiner was testifying to was a likelihood ratio. And I'm emphasizing ratio because the difference is, what the FBI examiner was testifying to was a sample of DNA from my client. And obviously, they had a known sample of DNA. They had a buccal swab of DNA from my client. So how likely would it be that the FBI examiner would get the same testing results from a sample of DNA from a questioned item if my client had contributed DNA to that testing sample? Now, Mr. Monin, if I could interrupt you for a second, let me see if I understand what happened at trial. And I haven't gone into the trial record yet, so maybe you can help me. Judge Cohen says in his new trial order on page 7 that the examiner testified incorrectly on three occasions, once with regard to the wig, once with regard to the gun, and once with regard to a hypothetical. But Judge Cohen also says that the examiner used the appropriate language when testifying about the gun and the wig during other portions of the testimony. So I think Judge Cohen saw this as a case where the evidence, the testimony wasn't completely incorrect but was sort of double-sided. And I'm wondering if you think that added to his decision that the right testimony would not have likely resulted in a different outcome. Yes, Your Honor. Judge Jordan, I see what you're saying in terms of Judge Cohen perhaps speaking to a weight issue, given that several times the DNA examiner testified appropriately. But my response to that would be as follows. First, she testified incorrectly with regard to the model of what her testimony would be. The hypothetical was at the outset of her testimony regarding a likelihood ratio. And again, a likelihood ratio is comparing two samples, one that includes my client's DNA and the other is a completely random sample of three or four contributors. So is it more likely that you would get the same result if my client had the same sample? That is the correct testimony. She testified, however, incorrectly with regard to the knife handle in giving the example of how likelihood ratios actually work, Judge Jordan. So I would contend there that at the outset of her testimony on likelihood ratios, she got it wrong. The other thing that is very, very important here is that there were two charged bank robberies. My client was arrested after the second charged bank robbery, obviously there, his identity is less of an issue. But after the first charged bank robbery, there was no one arrested. So what the government did in its order of proof is prove up the second in time bank robbery, including my client's arrest, then put the DNA examiner on to prove up the DNA and then the first bank robbery. And what I mean by that is that one of the times where the examiner testified incorrectly was on redirect examination with respect to the handgun, and the handgun, the government argued in its case that the handgun was so distinctive, it had a chrome and black coloration to it, that from the government's perspective, if they could prove that my client's DNA was on that handgun... Thank you. If they could prove, Judge Jordan, that my client's DNA was on that handgun, they basically could prove the first in time bank robbery. And the testimony there was that it was 4.6 million times more likely that my client had contributed DNA to the handgun, that he had contributed DNA to the handgun. And if you think about it, there's 300, basically 330 million Americans. So what she was saying to the jury is that there's only 600 other individuals, including individuals of every race, that could have contributed to that handgun. My client is African American. If you reduce the sample down to African Americans, it would likely be about 1 in 80 or 1 in 70. So that's the issue that I have with the DNA evidence in this case, is that where the examiner erred, it was in a way in which she was not just suggesting, but she was dictating that my client was a contributor of DNA to the reference sample, not this comparison notion of what likelihood ratios actually are. And it's not just me who's saying that. The FBI brought this to the attention of the U.S. Attorney's Office. To its credit, the U.S. Attorney's Office immediately notified me. So I think the FBI sees an issue with this, and Judge Cohen did struggle with it. I know this court has seen many new trial motions that have been denied very, very quickly by the courts. We have a 21-page order here from Judge Cohen, and I think he struggled with it because he knew the importance of the DNA evidence to the proof with respect to my client on the first-in-time bank robbery. I know I only have 30 seconds. The third asserted error on appeal is that after my client's arrest for the second-in-time bank robbery, he was put in a squad car. A police detective transported the victim's heller to the scene. My client was brought out of the vehicle in handcuffs, surrounded by the police. It's obvious. There's screaming and headlights and bright flashing lights that my client is the suspect, and he was identified, not specifically, but he was identified in general terms by the teller, and I just think that that violates pretty much every norm of suggestive and prejudicial show-ups that you can have, and the error was not only in suppressing the evidence, but the district court allowed that identification testimony to come in at trial when, frankly, it was just gratuitous, and, well, it was gratuitous because my client was already arrested at that point. The show-up case law speaks in terms of exigencies associated with identification of someone, the need to identify someone quickly in an emergent circumstance. My client had been arrested for 20 or 30 minutes by that point in time. Mr. Monnin, your argument has appealed to me, but how do you get around prior precedent, like Johnson versus Duggar, which allows a relatively similar identification with a one- or two-person show-up? I think the issue there, Judge Jordan, is that that type of identification goes to the investigation as opposed to the prosecution, and what I'm arguing here is that the link-up was is that it was offered as identification testimony at trial. It wasn't used investigationally. I mean, obviously, you can have a show-up, one- or two-person show-up, for investigative purposes. Is this the guy? And you continue the investigation from there. This is different because it was introduced in the trial as substantive identification testimony. I think that's the principal distinction. Okay, thank you very much. You've saved your time for rebuttal. Mr. Hobson, whenever you're ready. Thank you, Your Honor. May it please the court, my name is Brett Hobson, and I represent the United States. This court should affirm all three of the rulings that the defendant has challenged on appeal, and while I'm, of course, happy to discuss whichever issues the court prefers in whatever order, I'll go ahead and start with the FDIC issue, which the defendant started with. The defendant's argument on appeal focuses on whether the particular Bank of America branch was insured, and this is just a red herring. There is no more need to prove that the branch was insured than there is to prove that the teller had insurance. That is factually not how FDIC insurance works, and there was testimony on this point by both the Bank of America and NOAA reps at trial, and even more importantly, this is not what the bank robbery statute requires. Looking at the plain language... Can I ask you a question? I thought there was testimony that the particular branch had never missed a payment. Am I wrong about that? There was testimony that the bank had never missed a payment, and that it extended to the branches. There was testimony to that, but that wasn't even necessary, is the point. Under the statute, 2113A, it criminalizes taking money in the care of a bank, and then the deposits of which are insured by the FDIC. And here, the bank teller's testimony established that money was stolen that was in her care while she's working at Bank of America, and then the uncontradicted testimony of William Anderson, the Vice President of Corporate Security, established that Bank of America, the institution, was FDI insured on the day of the robbery. And so we're not in the world of Monk's Guard, which Mr. Monnan referenced. We're not talking about having to infer that the coverage extended to the day of the robbery. We have direct testimony on that point, at least twice, and I think maybe I'll cross as well from Mr. Anderson, that the bank was insured on the day of the robbery. There was no objection to this testimony. There was no challenge to the foundation, although Mr. Anderson explained how he knew it as part of his job. And thus, the government has met its burden under US v. Baldwin, which is 644 F 2nd 381 at 385. And that ends the inquiry. You don't have to prove that the bank branch was covered. Like I said, there's testimony explaining that there's one FDIC insurance number for the bank. It extends to all the branches. You know, it doesn't matter if the money was in a branch or was in a armored car on the way from one branch to another. It just has to be money in the care of Bank of America. This is Judge Hall. Anderson said the Bank of America was current on its quarterly payment. There was no indication that the insurance had ever lapsed, and Bank of America never received a cancellation notice. So are you saying that the insurance goes to the bank, not to the branches? Yes, Your Honor. That's exactly right. Did somebody explain that at trial or that's your inference from the testimony? Well, first of all, it doesn't have to be explained at trial, is my point. Based on the plain language of the statute, you don't have to explain that. It's the institution that has to have coverage. But it was explained at trial. Mr. Anderson explained on cross that the BOA rep testified even more clearly that FDIC insurance, there's one number for the bank, it applies to all the branches. That testimony is in in the record. And you know, I want to get to the DNA, unless there's another question on that right now. I want to get to the DNA issue because that's a little more complicated. It's important to remember. I do see that Anderson's, that the charter covered all BOA financial centers, including the Smyrna branch, robbed in this case, and there was no requirement for each branch to obtain separate insurance. Yes, Your Honor, that's exactly right. That's what the testimony of somebody was. Yes, Your Honor, that's correct. And, you know, and turning to the DNA issue, it's important to remember the posture we're in here with this DNA issue. The defendant filed a motion for a new trial based on newly discovered evidence. These motions are highly disfavored in the circuit and have been described as an uphill climb, and this court has repeatedly warned that they should be granted only with great caution and only in exceptional cases. And in order to grant the motion, the evidence must preponderate heavily against the verdict. And importantly, it is the defendant's burden to show that he was prejudiced and that a new trial is warranted. Now, this court, of course, reviews the lower court's denial of Mr. Caldwell's motion only for an abuse of discretion and looks at the same five-factor test that the district court looked at. And under this test, the defendant has to establish all five prongs to get a new trial. Here, however, Mr. Caldwell fails on all five prongs, but this court's analysis can begin and end with the fifth factor, and that is whether the new evidence at a retrial would probably result in an acquittal. And as the district court correctly ruled below, it simply would not. Now, in looking at this factor, we have to look at two questions. What is the new evidence, and what other evidence came in at trial that would come in again at trial? We have this two-page letter from the FBI lab giving its post-trial assessment of trial testimony. And the letter notes that the DNA examiner deviated three times at trial by using the word that when the word if was recommended in stating a likelihood ratio. But as the Office of General Counsel's email that transmitted this letter notes, the examiner's deviations were not an error. There is simply no statistical or practical significance to the deviation she made. That can't be right. It is right, Your Honor. You mean you mean to tell me that the testimony didn't change in any way because of her use of words? No, I mean to tell you that the use of words, all it did was make it an awkward delivery. It did not have any practical or statistical significance, and I'm happy to explain why that is. Go ahead. So at around this time, as also explained in that email that transmitted the letter, the FBI lab was switching from one statistic called a random match probability to a new one called a likelihood ratio. And the Office of General Counsel's lawyers, not experts themselves, were being abundantly cautious and sending letters about any deviation with respect to likelihood ratio statements that they uncovered during Ab's routine QA transcript reviews. And so let's talk about these deviations a bit. Well, first of all, it is not the government's burden to convince the court that the examiner's deviations were insignificant. It is the defendant's burden to convince the court that the deviations prejudiced him and that evidence about them would probably result in an acquittal at a new trial. I know, but you started out by saying that they weren't significant at all, so you get the question to answer. Absolutely, and I am happy to answer that question. I just want to make sure that in answering that question, I want the court to realize that the defendant had the burden, and he utterly failed to establish any reason that they matter. But I'm happy to explain why they don't. You know, he could have presented new testimony from a DNA expert, or a statistics expert, or someone to explain why these were significant, but he just offered his conjecture in the brief below and in the brief to this court. Well, Judge Cohen disagreed with you on these issues, right? No, he agreed that the... He thought they were material. Yes. So he disagreed with you. He found that they weren't significant enough to merit a new trial under the new trial standard, but he disagreed with your contention that these were not material, right? Yes, Your Honor, that's right. And a close reading of the FBI's letter, which admittedly is not a model of clarity, is instructive on this point. And it's understandable that Judge Cohen, I think, misread this letter. You know, it is a sort of dense little form letter saying that there's a deviation here, but a close reading of it really is helpful. The letter states, quote, the meaning of a letter can change if not stated precisely or if inadvertently transposed. And it's important to remember that word transposed, because I'm going to get back to it. The letter then gives two examples of how to state a likelihood ratio and what it means. There's one correct example and one incorrect example. And the letter explains that the subtle difference between these two examples technically changes the meaning. Now, the correct example was the DNA results are 1,000 times more likely if, and then some conditions. And the incorrect example was it is 1,000 times more likely that the individual is a contributor. So, what is the subtle difference between these two examples? The letter's incorrect example not only replaced the word if with that, which is all that the examiner did a few times at trial, but more importantly, from a statistical standpoint, it replaced the DNA results are 1,000 times more likely with it is 1,000 times more likely. Now, this is called transposing the conditional, and it is a common statistical error. And in doing this, in transposing the conditional, it changes the focus of the likelihood ratio statistic from the likelihood of getting the DNA results to the likelihood of the person being included as a contributor. And you think the jury would have figured all this out? Absolutely not, which is the whole point that it is not. That's why it's not material to the jury's verdict. It is so subtle that Mr. Caldwell says, well, we couldn't have even noticed this at trial. How could we expect to? We exercised due diligence. No one would have noticed. That's like saying that the DNA testimony is so incomprehensible that the jury doesn't pay attention to it, and which makes me wonder why you present it. No, Your Honor, that's not what we're saying at all. We're saying that this subtle difference is so subtle that it doesn't make a difference, and it doesn't have any practical or statistical significance. Now, if I had an hour, I could probably explain to you the statistics behind this transposing the conditional and why there is a subtle technical difference when you replace the DNA results are with it is. And I could also, if I had that time, explain to you why it doesn't really even matter if you do that, practically speaking, when we have very large likelihood ratios like we do in this case. But we don't have time to get into all those statistics. And suffice it to say that if the examiner had transposed the conditional, that is, if she had replaced the DNA results are with it is, that would have at least had some significance. There's still not enough to warrant a new trial here. But the DNA examiner never made this change at trial. Mr. Hobson, Judge Toflad. Yes, Judge. What did the government argue to the jury? The government, the experts, wait a minute, as to what the experts said? Yes, Your Honor, the government just argued to the jury that the DNA examiner had stated their, the DNA results, excuse me, that his prints were on the gun. Is that true, Your Honor? No, Your Honor. The government testified that the examiner had testified that the DNA, Mr. Caldwell's DNA was included on these items. And that is, as many cases in this court have said, a reasonable inference. I meant DNA. I'm sorry, but his DNA was on the gun. Yes, Your Honor. Yes, Your Honor. And, but the government said it in a way that was just a reasonable inference to draw. The government didn't overstate it and say, you know, because this, you know, and we didn't get into the statistics on closing and say, it's 4.6 million times more likely that he was on there. And none of that was talked about in closing. It was just a simple statement that his DNA was on these items. And importantly, the DNA examiner never made this transposing a conditional change at trial. On direct exam, she testified the DNA profile from the wig is 480,000 times more likely. The DNA that I obtained from the Smith and Wesson pistol was 4.6 million times more likely. And again, on redirect, the DNA from the wig was, the DNA from the gun was, and on her lab report, which was what went back with the jury as an exhibit, it was stated entirely correctly with if instead of that. And also the DNA typing results for the wig are, the DNA typing results for the pistol are. So again, it's not the government's burden to explain why this is insignificant, but this is why it's insignificant. And Mr. Caldwell cannot offer just his conjecture to establish that these were somehow significant and must have affected the jury. Well, let me, for my, for my part, let me just say that it would have been helpful had the government tried to present that sort of explanation in its brief. And it's just, it's just not there. Yes, Your Honor. And I apologize for that. It is a dense subject that we have struggled to even explain what the significance is. And it has only taken a long, a lot of work to even be able to get to that explanation. I apologize for not getting it in the brief, but you know, even if that had been a significant change, there was overwhelming other evidence. Counsel, you have a two minute warning. Thank you, Your Honor. Thank you, Ms. Geddes. There's overwhelming other evidence that was presented at trial that would be presented again on a retrial, which the district court noted. This letter would not exclude the DNA evidence on a retrial. You'd have the same lab report go back to the jury. You'd have the same conclusions that Mr. Caldwell has included as a contributor. You'd have the same numbers, the same statements of strength. All that would come in. You would also have substantial, overwhelming evidence of Mr. Caldwell's guilt, independent of the DNA evidence. You would apprehend him 10 minutes after the robbery, crouching behind a chimney, two streets away from the bank, et cetera. Is there anything to Mr. Monin's contention that we need to view the two robberies differently with regards to the impact, if any, of the mistaken DNA testimony? If there's any differences, it's that the DNA evidence went only to the Bank of America robbery. Mr. Caldwell essentially concedes that there's difference. He understandably tries to tie the DNA to the NOAA robbery, but no one did that at trial. It is nonsensical, and that's why the government didn't do it at trial. These items were found after Bank of America, and Mr. Caldwell's DNA was on them. Even though the government says that the bandana and gun looked like the same bandana and gun that were used, his DNA being on them after Bank of America doesn't prove that his DNA was somehow on them two weeks earlier, and that was never contended. There is overwhelming proof as to both. As to the NOAA bank robbery, he's the same height, same build, same sex. He has the same haircut. He didn't wear a wig there. He has the same distinctive high forehead hairline. He has similar clothing. He has the blue and white bandana and the black bag and the black and silver handgun again. He has the same MO, single robber, hesitates outside. And there's a computer store video from behind the bank that is incredibly clear and shows Mr. Caldwell's distinctive profile and high hairline. And frankly, that video alone could have convicted Mr. Caldwell of the NOAA bank robbery. And I'm happy to talk about it. I think I'm out of time, but I would be happy to explain that the limited ID was not suggestive and it was reliable, but we can stand on our briefs on that. I would just point out that this was a very limited ID. She said he's the same height and build and has the same clothing and the same sex and race of the robber. And the government emphasized at trial, you are not saying you recognize this guy's face that had a bandana on, right? And she said, no. And so this is a very reliable, limited identification. The police didn't do anything to enhance the suggestion. Thank you. All right. Thank you very much, Mr. Monning. Thank you, Your Honor. And I'm going to devote my rebuttal comments to the DNA proof. And Mr. Robson has the advantage of having access to the FBI in connection with his argument. I do not. So I'm not going to argue transposing the conditionals or anything like that. The fact remains they put the DNA evidence in because they wanted it for purposes of identity. They didn't really need it with respect to the Bank of America robbery. As I mentioned before, the order of proof in the case was to put the Bank of America robbery on first, then the DNA. I have a question for you. You said there were three times it was wrong and one of it was to the wig, right? That's correct. And then another time it was to the gun and the gun was found next to him at the time of the second robbery or in the bushes. Your Honor, both the wig and the gun were found in a bag that was nearby my client. Okay. So his connection to that was powerful alone without any DNA, right? That's true. I know that's like a robbery, but I'm dealing with these items that it was his wig and his gun. That was pretty solid without the DNA, right? Yes. Okay. What was the third one? Was there anything about the bandana or there was no DNA from the bandana? I think the third one you said was some type of hypothetical. Yes, Your Honor. The third one was the example that the examiner gave of how the likelihood ratio works and she was describing a knife contributor or as a suspect contributor. Okay. So that's why I was saying earlier in my opening argument. Was there any DNA as to the bandana? There was, Your Honor, but the important distinction... First of all, let me answer your question. That was done correctly or incorrectly? The bandana was done correctly and the examiner also said it was a 700 billion likelihood ratio. So she was saying with certainty my client had contributed DNA to the bandana, but the bandana was used in connection or a bandana was used in connection with the first in time bank robbery, but the predominance of the evidence or the argument and the evidence that was put on by the government as to identity on the first in time, the NOAA bank robbery, really did center on the gun. The agent testified as to how the gun was handled by the robber. They pointed out the distinctive coloring on the gun and in the crystal clear video that Mr. Hobson describes, there's no gun that's displayed there and what we're talking about is at the time of the robbery when the robber is in the bank, the images are very indistinct of the robber and the eyewitness testimony in relation to the robber's identity is not consistent with the Bank of America robber. Their heights are different. The bandana is identified as being a different color than the bandana used in the Bank of America robbery. So it really does, identity for purposes of the first in time bank robbery focuses on the handgun and that's where there was incorrect DNA testimony. And I'm also, look, I'm trying to understand the argument. The handgun was found next, you know, right near him at the time of the second robbery. So that someone now says, I mean, there was overwhelming evidence that he'd had that handgun and it was with the bag, you said, and it was with the wig. So that's a gun and we know what the gun looks like and I take it the tellers from the first robbery said that's what the gun looked like in hours too. Is that correct? Did they say that's what the gun looked like? It was the agent, the FBI agent who testified about the first bank robbery in its comparison to the Bank of America bank robbery. Okay. So I'm trying to understand how the DNA is really involved since he was found in proximity of the gun with the bag and the wig. So that's his gun. The distinctive, the DNA didn't do anything to the distinctiveness of the gun. I'm trying to see how it was prejudicial, even if it was incorrect. Well, I understand your that you're taking the position that it may not be outcome determinative. My client may not deserve another trial. I'm trying to see it'd be a different case. If they didn't, this was just some random gun somebody found and they were using the DNA to link him to the gun. Okay. That's it. But here the link to the gun was he was found with a gun right after the bank robbery. And I'm trying to see what I'm missing. Even if the gun was a focal point of the first robbery, which I accept that it was because he didn't have a wig and there's no DNA from the bandana. So the first robbery travels on the eyewitness testimony and the gun. But I'm trying to see how the DNA undermines, makes a difference when he was found with a gun. Does that make sense? What I'm trying to say. It does, Your Honor. Okay. What I would say in response to that, I mean, I think, and I don't mean to put words in your mouth, but I think what you're saying is, aren't we really just talking about the DNA largely being cumulative of the other identifying evidence about the defendant being the robber? That's a better way of saying it. We had DNA was cumulative. You said it better. Well, I think we're still talking about the DNA having been offered by the government. I've also cited case law, and I think we're all aware on this phone of the significance of DNA evidence. I mean, the jurors perked up. I was there in court. They paid attention to the examiner's testimony. They're interested in this material. In my think about, and I don't have evidence on this, but they want to think about all evidence that is offered to them as to identity. And yes, we did have a relatively distinctive handgun used in both crimes, but the government still made the decision to put on the examiner and the examiner testified improperly about the likelihood that my client had contributed DNA to a mixture of DNA on the handgun. It wasn't just that there was one individual's DNA on the handgun. Okay, thank you. You've answered my question. All right, Mr. Monin, thank you very much. We really appreciate the argument from you and from Mr. Hobson. Thank you, John.